**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| PLANNED PARENTHOOD SOUTHWEST OHIO REGION, *et al.*, | |
| Plaintiffs, | Case No. 1:19-cv-118 |
| v. | |
| DAVID YOST, in his official capacity as Attorney General of the State of Ohio, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND/OR
TEMPORARY RESTRAINING ORDER
AND MEMORANDUM OF LAW IN SUPPORT**

## MOTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Planned Parenthood Southwest Ohio Region (PPSWO), Planned Parenthood of Greater Ohio (PPGOH), Sharon Liner, M.D., and Women's Med Group Professional Corporation (WMGPC) move for a preliminary injunction enjoining Defendants David Yost, Attorney General of Ohio; Michael O'Malley, Cuyahoga County Prosecutor; Ronald O'Brien, Franklin County Prosecutor; Joseph Deters, Hamilton County Prosecutor; and Mathias Heck, Montgomery County Prosecutor, from enforcing Ohio Rev. Code § 2919.15, which will go into effect, absent an order of this Court, on March 22, 2019. Should the Court be unable to enter the requested preliminary injunction before the Act takes effect, Plaintiffs respectfully request the Court enter a temporary restraining order.

Pursuant to Rule 65(b)(1)(B), the undersigned counsel certify that upon electronically filing this motion and the Complaint using the Court's CM/ECF system, counsel will electronically mail the filed documents to: David Yost, Ohio Attorney General; Michael O'Malley, Cuyahoga County Prosecutor; Ronald O'Brien, Franklin County Prosecutor; Joseph Deters, Hamilton County Prosecutor; and Mathias Heck, Montgomery County Prosecutor.

Plaintiffs request that the injunction be granted without bond.

## MEMORANDUM IN SUPPORT

The Ohio legislature recently enacted Ohio Rev. Code § 2919.15 (the Act), which criminalizes the performance of an abortion using the dilation and evacuation (D&E) method, "the most commonly used method for performing previability" abortions after approximately 15 weeks of pregnancy, and the only method that can be performed outside a hospital after this gestational age. *Stenberg v. Carhart*, 530 U.S. 914, 945 (2000). This is the latest salvo in Ohio's unremitting assault on women's right to safe and lawful abortions, and part of a broader campaign to limit abortion access and force providers to substitute their professional medical judgment for lawmakers' ideology. The Act is unconstitutional and should be enjoined.

Plaintiffs—Ohio providers of women's health and abortion services—amply satisfy all the requirements for emergency injunctive relief. The Act is unconstitutional under binding Supreme Court and Sixth Circuit precedent holding that a ban on D&E abortions imposes an undue burden. *See, e.g.*, *Stenberg*, 530 U.S. at 945. As the Sixth Circuit has made clear, a ban on D&E is "simply barred." *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 330 (6th Cir. 2007). *Every* court to have considered a similar ban has held it unconstitutional. *See, e.g.*, *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310 (11th Cir. 2018); *Whole Woman's Health v. Paxton*, 280 F. Supp. 3d 938 (W.D. Tex. 2017).

Plaintiffs and their patients will be irreparably harmed if the Act is permitted to take effect on March 22, 2019, as currently scheduled. The Act unduly burdens a woman's constitutional right to obtain an abortion by requiring that, before obtaining a D&E, she must first undergo a procedure to cause fetal demise. To cause demise, Plaintiffs would have to subject every patient to a separate, invasive procedure that increases the risk to the woman without any evidence-based medical benefit. And there is no guaranteed way to safely ensure fetal demise in every case. Nor is there any way for a physician to know whether a demise

1

procedure will work in any given case. Because they cannot guarantee their patients' safety while complying with the demise requirement, some physicians will be forced to consider abandoning the provision of D&Es entirely. Others are concerned that if they continue performing D&Es to provide necessary abortion services to their patients, the demise requirement would prevent them from exercising their clinical judgment regarding what is best for each patient.

The equities and the public interest strongly support maintaining the status quo while this case is litigated. Hundreds of women seek second-trimester abortion services in Ohio each year for an array of personal and medical reasons. Delaying or impeding access to the most common second-trimester abortion method violates women's constitutional rights and creates other immediate and irreversible consequences. By contrast, an injunction will merely preserve the longstanding status quo; it will impose no burden on the government to require compliance with decades of constitutional precedent protecting women's access to abortion.

Plaintiffs, therefore, respectfully request that the Court act on an expedited basis and preliminarily enjoin this unconstitutional law prior to its March 22, 2019 effective date, and if it is unable to so act, enter a temporary restraining order, to prevent the State from inflicting irreparable harm on women in need of reproductive health care.

## STATEMENT OF FACTS

### A. Abortion in Ohio

Legal abortion is one of the safest medical procedures in the United States and is markedly safer for women than childbirth. Declaration of Lisa Keder, M.D., M.P.H. (Keder Decl.) ¶ 13; *see also Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2315 (2016) ("Nationwide, childbirth is 14 times more likely than abortion to result in death[.]"); *id.* at 2320

(Ginsburg, J., concurring) (noting that "abortion is one of the safest medical procedures performed in the United States" (citing the American College of Obstetricians and Gynecologists (ACOG) et al.'s Amicus Br. 6-10)). Abortion is also very common; approximately one-quarter of women nationwide will have an abortion at some point in their lifetime. Keder Decl. ¶ 15.[1]

The vast majority of abortions—more than 85% in Ohio—occur during the first trimester of pregnancy, which lasts up through approximately 13.6 weeks[2] gestational age, measured from the first day of the woman's last menstrual period (LMP).[3] Keder Decl. ¶ 15. Women seek abortions for many reasons, including poverty, youth, and having completed one's family. *Id.* ¶ 16. Reasons that women seek an abortion after the first trimester include late confirmation of pregnancy, delay in obtaining funds necessary for the procedure and related expenses (travel, childcare), or difficulties locating and travelling to a provider. *Id.* In addition, the identification of most major fetal anatomic or genetic anomalies occurs in the second trimester, and women may seek an abortion for this reason. *Id.*

During the first trimester of pregnancy, there are two types of abortion: medication and surgical. Keder Decl. ¶ 18. A medication abortion, which is available only up to 10.0 weeks LMP in Ohio, involves taking two types of medication (pills), usually one day apart. *Id.*

---

[1]     *See also* Declaration of Jennifer Branch (Branch Decl.) Ex. B (Jones & Jerman, *Population Group Abortion Rates and Lifetime Incidence on Abortion: United States, 2008-2014*, 107 Am. Pub. Health Ass'n 1904, 1908 (Dec. 2017)).

[2]     Throughout this brief, as is common in the medical literature, gestational age is written as the number of weeks, followed, after the decimal point, by the number of days of the subsequent week. For example, "14.0 weeks" represents a gestational age of 14 weeks, 0 days, while "17.6 weeks" represents a gestational age of 17 weeks, 6 days.

[3]     *See* Branch Decl. Ex. C (Ohio Dep't of Health, *Induced Abortions in Ohio* 9 (2017), https://odh.ohio.gov/wps/wcm/connect/gov/89d03903-856b-4a70-8022-b908fccce800/VS-AbortionReport2017.pdf?MOD=AJPERES&CONVERT_TO=url&CACHEID=ROOTWORKS PACE.Z18_M1HGGIK0N0JO00QO9DDDDM3000-89d03903-856b-4a70-8022-b908fccce800-mrWcCSZ (finding that 85.5% of Ohio abortions occur prior to 13 weeks gestation)).

Surgical abortions in the first trimester are performed by dilating (opening) the woman's cervix and then using suction to remove the contents of the uterus, including the fetus and placenta. *Id.*

During the second trimester, which begins at approximately 14 weeks LMP, the vast majority of abortions are performed using D&E,[4] which ACOG explains is "evidence-based and medically preferred because it results in the fewest complications for women compared to alternative procedures" at that stage of pregnancy.[5] D&E involves two steps: first, dilation of the cervix and second, removal of the fetus, placenta, amniotic fluid, and uterine lining with surgical instruments. Keder Decl. ¶ 19; *see Paxton*, 280 F. Supp. 3d at 947-48. Dilation is achieved over a period of hours, up to one day ahead of the evacuation portion of the procedure. Keder Decl. ¶ 20. As the physician evacuates the uterus, because the cervical opening is narrower than the fetus, some separation of fetal tissues usually occurs as the physician uses instruments to bring the tissue through the cervix. *Id.* ¶ 21; *Paxton*, 280 F. Supp. 3d at 946, 948. The whole evacuation process generally takes approximately 10 minutes and is safely performed as an outpatient procedure. Keder Decl. ¶ 21.

The only medically proven alternative to D&E is induction abortion, in which a physician uses medication to induce labor and delivery of a non-viable fetus. Keder Decl. ¶ 24; *see Paxton*, 280 F. Supp. 3d at 948. Induction abortions must be performed in a hospital or similar facility that has the capacity to monitor the patient overnight—exposing women to the ordinary risks (*e.g.*, of infection) attendant to hospitalization. Keder Decl. ¶¶ 24-25; *see Paxton*, 280 F.

---

[4]    Branch Decl. Ex. D (O'Connell et al., *Second-trimester surgical abortion practices: a survey of National Abortion Federation members*, 78 Contraception 492, 497 (Dec. 2008)).

[5]    Branch Decl. Ex. E (ACOG, *ACOG statement regarding abortion procedure bans*, (Oct. 9, 2015), https://www.acog.org/About-ACOG/News-Room/Statements/2015/ACOG-Statement-Regarding-Abortion-Procedure-Bans?IsMobileSet=false; *see also* Keder Decl. ¶ 18 (explaining that by around 15 weeks LMP, suction alone is no longer sufficient to perform an abortion)); *see Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 198 (6th Cir. 1997).

4

Supp. 3d at 948.  Though still relatively safe, induction abortions are riskier than D&Es.  Keder

Decl. ¶ 22.  Because induction abortions require inpatient treatment and can last between eight

hours and three days, they are also extremely expensive.  *Id.* ¶ 24; *see Paxton*, 280 F. Supp. 3d at

948.  For these reasons, induction is an uncommon method of abortion both nationally and in

Ohio.  Keder Decl. ¶ 26; *see Paxton*, 280 F. Supp. 3d at 948.

### B. Plaintiffs' Provision of Reproductive Health Services, Including Abortion

Plaintiffs and their physicians, including Plaintiff Dr. Liner, have dedicated their

professional lives to providing high-quality, compassionate reproductive health care to women in

Ohio, including abortion services.  *See* Declaration of Sharon A. Liner, M.D. (Liner Decl.)

¶¶ 1, 3; Declaration of Katherine Rivlin, M.D. (Rivlin Decl.) ¶¶ 1-2; Declaration of W.M. Martin

Haskell (Haskell Decl.) ¶¶ 3, 5.[6]  Plaintiff Planned Parenthood Southwest Ohio Region

(PPSWO), operates a surgical center in Cincinnati, at which Dr. Liner performs abortions and

which offers medication abortions up to 10.0 weeks LMP and surgical abortions up to 21.6

weeks LMP.  Liner Decl. ¶ 3.  Plaintiff Planned Parenthood of Greater Ohio (PPGOH) operates

two surgical centers that provide abortion services in East Columbus and Bedford Heights.

These surgical centers offer medication abortions up to 10.0 weeks LMP and surgical abortions,

including D&E, up to 19.6 weeks LMP and 18.6 weeks LMP respectively.  Rivlin Decl. ¶ 10.

Women's Med Group Professional Corporation (WMGPC) operates a surgical center in

Kettering that provides abortion services, including medication abortions up to 10.0 weeks LMP

and surgical abortions up to 21.6 weeks LMP.  Haskell Decl. ¶¶ 8, 10-11.  No outpatient

---

[6]     It is well established that physicians have standing to assert their own as well as their patients' constitutional rights in cases challenging abortion restrictions.  *See, e.g.*, *Singleton v. Wulff*, 428 U.S. 106, 117-18 (1976); *Planned Parenthood of Cent. Missouri v. Danforth*, 428 U.S. 52, 62 (1976); *Planned Parenthood Ass'n of Cincinnati, Inc. v. City of Cincinnati*, 822 F.2d 1390, 1396 (6th Cir. 1987).

providers in Ohio perform induction procedures, and abortions are only available in hospitals in extremely limited situations of fetal anomalies and maternal health issues.

### C. Existing Hurdles to Obtaining Abortion Services in Ohio

Women in Ohio already face significant hurdles to accessing abortion. *See* Keder Decl. ¶ 14. Ohio requires women to make an additional "informed consent" trip to a physician at least 24 hours in advance of her procedure to receive a state-mandated ultrasound and counseling. Ohio Rev. Code §§ 2317.56, 2919.191, 2919.192; *Cincinnati Women's Servs.*, *Inc. v. Taft*, 468 F.3d 361, 363 (6th Cir. 2006). It is unlawful to perform an abortion when the "probable post-fertilization age" is twenty weeks or greater.[7] Ohio Rev. Code § 2919.201. Physicians must also determine whether there is a detectable fetal heartbeat prior to providing an abortion, and if so, must inform the pregnant woman in writing. *Id.* §§ 2919.191-.192. Clinics performing surgical abortions must be licensed as an ambulatory surgical facility and secure a written transfer agreement with certain hospitals within 30 miles of their location. *Id.* §§ 3702.30, 3702.303, 3727.60(B)(1); *Planned Parenthood Sw. Ohio Region v. Hodges*, 138 F. Supp. 3d 948, 951 (S.D. Ohio 2015). Ohio law also bans dilation and extraction (D&X) or intact D&E abortions, Ohio Rev. Code § 2919.151, which abortion opponents call "partial-birth abortion."[8] In 2018, Ohio passed a law prohibiting abortion if one reason for a woman's decision to terminate her

---

[7]    20 weeks post-fertilization corresponds to 22.0 weeks LMP.

[8]    The ban on D&X procedures was upheld because it explicitly exempted D&Es. *See Women's Med. Prof'l Corp. v. Taft*, 353 F.3d 436, 451, 453 (6th Cir. 2003). S.B. 145 specifically removes the exception for standard D&Es that was contained in the ban on D&X procedures, further evidence that the legislature's intent was to ban D&E procedures.

pregnancy is a fetal indication of Down syndrome.  *Id.* § 2919.10.  While that last restriction is enjoined, these restrictions have led to greatly reduced abortion access in Ohio.[9]

### D.    Ohio Enacts S.B. 145 Banning D&E

Ohio's D&E ban is the State's latest attempt to impose burdensome, medically unnecessary restrictions on abortion in violation of a woman's constitutional rights.  The ban criminalizes the performance of what the statute calls a "dismemberment abortion."  Although the statute does not use medical terms, its definition makes clear that it prohibits the dilation and evacuation, or D&E, procedure.[10]  Keder Decl. ¶ 9.  The ban only exempts D&Es if there is a "serious risk [to the woman] of the *substantial* and *irreversible* physical impairment of a major bodily function."  Branch Decl. Ex. A (S.B. 145, creating Ohio Rev. Code § 2919.15) (emphases added).  Violating the Act constitutes a fourth-degree felony and subjects physicians to civil liability and potential loss of their medical license if convicted of violating the statute.  The Act is scheduled to take effect on March 22, 2019.

The Act does not apply if the physician—through a separate, invasive procedure—causes fetal demise before starting the second (*i.e.*, evacuation) phase of the D&E.  As is discussed in

---

[9]    *Compare* Jones & Jerman, *Abortion Incidence and Service Availability in the United States, 2014*, 49 Pers. on Sexual & Reprod. Health 17, 23 (Mar. 2017), *and* Jones & Jerman, *Abortion Incidence and Service Availability in the United States, 2011*, 46 Pers. on Sexual & Reprod. Health 3, 9 (Mar. 2014).

[10]    S.B. 145 defines "dismemberment abortion" as follows:

> "[D]ismemberment abortion" means, with the purpose of causing the death of an unborn child, to dismember a living unborn child and extract the unborn child one piece at a time from the uterus through use of clamps, grasping forceps, tongs, scissors, or similar instruments that, through the convergence of two rigid levers, slice, crush, or grasp a portion of the unborn child's body to cut or rip it off. "Dismemberment abortion" does not include a procedure performed after the death of the unborn child to extract any remaining parts of the unborn child.

Branch Decl. Ex. A.  S.B. 145 "does not prohibit the suction curettage procedure of abortion or the suction aspiration procedure of abortion."  *Id.*

more detail below, this means that women would have to endure one of three procedures prior to

having an abortion: (1) an injection of a medication called digoxin through her abdomen or

vagina; (2) an abdominal injection of potassium chloride (KCl) into the fetal heart; or (3) an

umbilical cord transection in which the physician divides the umbilical cord prior to evacuation.

Each of these procedures adds additional risks without providing any evidence-based medical

benefits to patients. *See Paxton*, 280 F. Supp. 3d at 953. According to ACOG, "[n]o evidence

currently supports the use of induced fetal demise to increase the safety of second-trimester

medical or surgical abortion." Keder Decl. ¶ 29 (citing ACOG, *Practice Bulletin Number 135:*

*Second-Trimester Abortion*, 121 Obstetrics & Gynecology 1394, 1396, 1406 (2013)).[11] While

burdensome for all women, the Act exposes women with gestational ages between 15.0 and 18.0

weeks LMP to particularly heightened risk; for these women, demise procedures would amount

to experimental procedures, would be inconsistent with the standard of care, and would be

particularly difficult due to the extremely small fetal size.

### 1. Digoxin injections

Some physicians, including some of Plaintiffs' providers, attempt demise via digoxin

injections prior to performing a D&E after 18.0 weeks LMP; but they do so to ensure compliance

with state and federal bans on D&X abortions rather than because of any benefit established by

the medical literature.[12] Liner Decl. ¶¶ 15, 17; Rivlin Decl. ¶ 18; Haskell Decl. ¶ 14. Digoxin

injections entail using a long hypodermic needle to administer the drug either transabdominally

---

[11]     Courts have routinely relied on the medical expertise of the ACOG, the largest
professional organization of OB/GYNs in the United States, in cases dealing with abortion
restrictions. *See, e.g.*, *Hellerstedt*, 136 S. Ct. at 2312; *Planned Parenthood Ass'n of Kansas City,*
*Mo., Inc. v. Ashcroft*, 462 U.S. 476, 488 n.10 (1983); *Voinovich*, 130 F.3d at 198 n.7.

[12]     Under those existing laws, a physician who tries but fails to cause demise would not be
prosecuted, *see* 18 U.S.C. § 1531(b)(1)(A); Ohio Rev. Code § 2919.151(5)(G), whereas the Act
contains no such safe harbor.

(through the abdomen into the uterus) or transvaginally (through the vaginal wall or cervix) on the day prior to the evacuation. Liner Decl. ¶ 15. For pregnancies before 18.0 weeks LMP, the injections are a wholly unproven and untested method of demise, and the practice at all of the Plaintiffs' facilities is not to attempt it. *Id*. ¶ 17; Rivlin Decl. ¶¶ 16, 18; Haskell Decl. ¶ 21-22. Doing so would therefore subject women to experimental treatment without any medical justification. Liner Decl. ¶ 23; Rivlin Decl. ¶ 18; Keder Decl. ¶¶ 31, 35; *see Paxton*, 280 F. Supp. 3d at 950.

At all stages of pregnancy, digoxin carries risks beyond the risks associated with the D&E procedure itself. Digoxin is administered via injection and thus increases the woman's risk of infection. Keder Decl. ¶ 32; *see Paxton*, 280 F. Supp. 3d at 949. It also increases the risk of a woman delivering a non-viable fetus outside of a healthcare facility, which could be dangerous to her health and cause significant pain and emotional distress. Rivlin Decl. ¶ 17. Some patients find the injection painful. Keder Decl. ¶ 30. The long needle required may also cause anxiety, and for some women, knowing that the fetus is receiving the injection can be emotionally difficult. Liner Decl. ¶ 15; Keder Decl. ¶ 30; *see Paxton*, 280 F. Supp. 3d at 949. Digoxin injections are also difficult or impossible to perform on some women due to obesity, fibroids, or fetal positioning. Keder Decl. ¶ 36; *see Paxton*, 280 F. Supp. 3d at 949. And they can be dangerous for women with certain cardiac conditions, like arrhythmia. Keder Decl. ¶ 36.

Moreover, digoxin fails to cause demise after 24 hours in up to 10% of cases, and there is no way to know in advance whether it will fail. Keder Decl. ¶ 34. If the Act were to take effect, in order to ensure demise, the physician would have to attempt a second injection in the case of an initial failure. *Id*. ¶ 35. But such repeat injections are unstudied and are not used in Ohio abortion practice. *Id.*; Rivlin Decl. ¶ 19; Liner Decl. ¶¶ 16, 19; Haskell Decl. ¶ 16; *see*

*Williamson*, 900 F.3d at 1323.  Performing a second injection and waiting to confirm fetal demise could also delay the procedure for another day for no medical reason.  Keder Decl. ¶ 35.  Such a delay poses risks to the patient, since a patient's cervix will already be dilated following the first injection, and there is no guarantee that a second injection would work.  Liner Decl. ¶ 19.  The better course for the patient's health in the case of failure following one digoxin injection is to complete the procedure (as Ohio physicians who use digoxin do).  *Id.*; Haskell Decl. ¶¶ 17-18.  But doing so would violate the Act, and the effects of delaying for a second injection, while harmful, are very unlikely to meet the Act's narrow exception for "a serious risk of the substantial and irreversible impairment of a major bodily function."  Branch Decl. Ex. A; *see* Keder Decl. ¶¶ 35, 46.

### 2. Potassium chloride injections

Fetal demise can also be accomplished through the use of potassium chloride (KCl).  But in order to reliably cause demise, KCl must be injected directly into the fetal heart, which is difficult given its extremely small size.  Keder Decl. ¶ 39; *Paxton*, 280 F. Supp. 3d at 950.  Inadvertent injection of KCl into the patient's bloodstream carries the serious risk of cardiac arrest and fatality for the patient.  Keder Decl. ¶ 39; *see also Paxton*, 280 F. Supp. 3d at 950.  Given its complexity, the procedure requires extensive training typically provided only to sub-specialists in high-risk obstetrics, known as maternal-fetal medicine (MFM) specialists.  Keder Decl. ¶ 40; *see Paxton*, 280 F. Supp. 3d at 950.  None of the Plaintiffs has this training, nor do any use KCl in their clinical practice.  Rivlin Decl. ¶ 20; Liner Decl. ¶ 22; Haskell Decl. ¶ 19.

### 3. Umbilical cord transection

Finally, fetal demise can be accomplished through umbilical cord transection (UCT), which requires inserting an instrument or suction tube into the uterus, locating and securing the umbilical cord, and then transecting (dividing) it.  Keder Decl. ¶ 41.  Like digoxin, UCT does not

provide physicians with a feasible, reliable means of complying with the Act for at least three reasons. *See* Rivlin Decl. ¶¶ 22-23; Liner Decl. ¶¶ 21, 25; Haskell Decl. ¶¶ 20, 23.

*First*, UCT subjects women to health risks without any medical benefit, as the procedure may require the physician to make multiple additional passes of instruments into the woman's uterus, which increases the risk of uterine perforation, cervical injury, heavy bleeding, and infection. Keder Decl. ¶ 44; *see Williamson*, 900 F.3d at 1323. If a physician is able to transect the cord, she must wait for demise to occur, which can take approximately 10 minutes. Keder Decl. ¶ 41. UCT therefore would significantly prolong the D&E process, potentially taking as long as the D&E procedure itself, which increases risks to the patient. *Id.* ¶¶ 41, 42; *see Paxton*, 280 F. Supp. 3d at 948, 951.

*Second*, while attempting to reach for the cord with instruments, a physician may accidentally grasp and remove fetal tissue instead of the cord, as the cord and tissue are virtually impossible to distinguish on an ultrasound once the amniotic fluid has been drained. Keder Decl. ¶¶ 42-43. This would constitute a D&E without demise—a violation of the Act. *See* Branch Decl. Ex. A; *Williamson*, 900 F.3d at 1323. Thus, with each attempted UCT, physicians would risk unintentionally violating the Act.

*Third*, locating the cord is not always possible, depending on the position of the fetus and the gestational age of the pregnancy. UCTs are difficult to perform, particularly in earlier pregnancies when the cord is extremely small. Keder Decl. ¶ 43; *see Williamson*, 900 F.3d at 1323. In other cases, access to the cord may be blocked by the fetus. Keder Decl. ¶ 43; *see Paxton*, 280 F. Supp. 3d at 951. If a physician is unable to locate the cord and complete transection, she would need to move forward with the procedure because the patient's cervix is

already dilated and her amniotic fluid drained, but this situation is very unlikely to meet the D&E Ban's narrow exception. Keder Decl. ¶¶ 45-46.

In short, there is no safe, reliable way to guarantee demise in 100% of cases, Keder Decl. ¶ 27; *see Williamson*, 900 F.3d at 1327 n.14, 1329, and therefore no way for physicians to begin any D&E procedure without fear of criminal prosecution, Rivlin Decl. ¶¶ 4, 19, 25. There are some women for whom, due to physical characteristics or underlying health conditions, no demise procedure is safe or feasible. *Id.* ¶ 25; Keder Decl. ¶ 27. In addition, demise attempts will sometimes simply fail, forcing Plaintiffs to choose between making a second attempt (which would be untested, experimental, and prolong the procedure), proceeding with the procedure (which would be in the patient's best interest but risk prosecution), or waiting for the patient's condition to deteriorate to the point where the Act's narrow health exception is triggered. Keder Decl. ¶ 35; *see Williamson*, 900 F.3d at 1329. Faced with these constraints, some Ohio physicians would consider abandoning the practice of D&E and referring patients seeking second-trimester abortions out of state. Keder Decl. ¶ 11. Others would be forced to substitute their best medical judgment and the patient's best interests with the ideology of Ohio lawmakers to continue providing D&Es, at risk to their patients' health. *See* Rivlin Decl. ¶ 25; Haskell ¶ 24.

## ARGUMENT

"In evaluating a request for a preliminary injunction, a district court should consider: (1) the movant's likelihood of success on the merits; (2) whether the movant will suffer irreparable injury without a preliminary injunction; (3) whether issuance of a preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of a preliminary injunction." *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012). "None of these factors, standing alone, is a prerequisite to relief; rather, the court should

balance them." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) (internal quotations omitted). Each of the four factors weighs heavily in favor of Plaintiffs.

## I.    Plaintiffs Are Likely To Prevail On The Merits

### A.    The Act's Ban On D&E Abortions Is Unconstitutional

The Act violates four decades of unwavering Supreme Court precedent holding that it is unconstitutional to ban the most common method of abortion because such a ban is an undue burden. *See Gonzales v. Carhart*, 550 U.S. 124 (2007); *Stenberg v. Carhart*, 530 U.S. 914 (2000); *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52 (1976). Likewise, the Sixth Circuit has repeatedly applied that precedent to strike down laws that effectively banned D&E. *Northland Family Planning v. Cox*, 487 F.3d 323 (6th Cir. 2007); *Eubanks v. Stengel*, 224 F.3d 576 (6th Cir. 2000); *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187 (6th Cir. 1997).[13] And *every other court* to consider statutes nearly identical to the Act have applied that same precedent and found them unconstitutional.[14]

In *Danforth*, the Supreme Court first held that a statute outlawing the most prevalent method of second-trimester abortions is unconstitutional when there are no "safe alternative" options. 428 U.S. at 76-79 (considering a ban on the saline amniocentesis procedure, the method of abortion used in approximately 70% of abortions after the first trimester at that time). The State contended that alternative procedures remained available, but the Court rejected that argument: one proposed alternative had been used only on an experimental basis, *id.* at 77, and thus was not "available[] in any meaningful sense of that term," *id.* at 77 n.12, and others were

---

[13]    In fact, in the single instance in which the Sixth Circuit upheld a procedure ban, it did so only and precisely because it "secure[d], by means of an explicit exception, the continued availability of traditional D&E." *Women's Med. Prof'l Corp. v. Taft*, 353 F.3d 436, 452 (6th Cir. 2003).

[14]    *See, e.g.*, *Williamson*, 900 F.3d 1310; *Paxton*, 280 F. Supp. 3d 938.

similarly unacceptable, as they would "force[] a woman and her physician to terminate her pregnancy by methods *more dangerous to her health* than the method outlawed," *id.* at 79 (emphasis added). Given the lack of safe alternatives, the ban constituted "an unreasonable or arbitrary regulation designed to inhibit, and having the effect of inhibiting, the vast majority of abortions after the first 12 weeks" and could "not withstand constitutional challenge." *Id.*

The Supreme Court reiterated the principle that an abortion regulation prohibiting the most common second-trimester abortion method is unconstitutional when it struck down a Nebraska law purporting to target a less common abortion method, D&X, because the law was written so broadly that it banned D&E, the "most commonly used" second-trimester procedure, as well. *Stenberg*, 530 U.S. at 948. The Court reasoned that by "impos[ing] an undue burden on a woman's ability to choose a D&E abortion, [the law] thereby *unduly burden[ed] the right to choose abortion itself*." *Id.* at 930 (emphasis added). As the Sixth Circuit later explained, "*Stenberg*'s holding is relatively straightforward: if a statute prohibits pre-viability D&E procedures, it is unconstitutional." *Northland Family Planning*, 487 F.3d at 330.

In 2007, the Court again reaffirmed that a ban on D&E is unconstitutional. In *Gonzales*, 550 U.S. at 150-54, the Court upheld a federal statute restricting D&X precisely because it explicitly *exempted* standard D&E, "the usual [second-trimester] abortion method," *id.* at 135. Unlike the statutes at issue in *Danforth* and *Stenberg*, the statute in *Gonzales* permitted the ongoing use of "a commonly used and generally accepted method, *so* it does not construct a substantial obstacle to the abortion right." *Id.* at 165 (emphasis added). That is, a ban on a minority procedure was permissible only because there remained an accessible, common alternative—D&E—that had "extremely low rates of medical complications" and was "the safest method of abortion during the second trimester." *Id.* at 164 (internal quotations omitted).

14

Sixth Circuit precedent confirms what this line of cases makes clear: a statute that prohibits D&E "create[s] an unconstitutional undue burden on a woman's right to terminate her pregnancy." *Northland Family Planning*, 487 F.3d at 339; *see Voinovich*, 130 F.3d at 201. That principle "has in no way been undermined" by the Court's decision in *Gonzales*. 487 F.3d at 339. In *Northland Family Planning*, the Sixth Circuit found that a Michigan law banning D&E posed an unconstitutional undue burden because there were no safe and reliable alternative second-trimester abortion methods. *Id.* at 329-30.[15] Induction abortion, for example, carries with it "all the potential complications of labor and delivery at term," and thus entails more pain, expense, and risk of infection. *Id.* (internal quotations omitted). Other alternatives, such as removal of the uterus (which leaves the woman sterile), are "obviously much more invasive and dangerous" than D&E. *Id.* at 330.[16]

Given the Supreme Court's clear instruction on this point, courts outside the Sixth Circuit have *uniformly* concluded that D&E bans are unconstitutional. *See, e.g.*, *Hope Clinic v. Ryan*, 249 F.3d 603, 604-05 (7th Cir. 2001) (per curiam); *Causeway Med. Suite v. Foster*, 221 F.3d 811, 812 (5th Cir. 2000); *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 145-46 (3d

---

[15]  Indeed, in another case, while the Sixth Circuit upheld a law banning medication abortions at some (but not all) gestational ages, it was clear that "[t]he parties agree[d]" that the alternative procedure was "extremely safe." *Planned Parenthood Sw. Ohio Region v. DeWine*, 696 F.3d 490, 494 (6th Cir. 2012). In fact, that court upheld an injunction covering those instances when the alternative would pose a threat to women's health. *Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 518 (6th Cir. 2006).

[16]  Before *Stenberg*, the Sixth Circuit reached the same conclusion with respect to an Ohio law purporting to ban D&X, but which the evidence showed also prohibited D&E. *See Voinovich*, 130 F.3d at 198-99. As is still true today, the evidence also showed that D&E was "the most common method of abortion in the second trimester." *Id.* at 198. Therefore, the Sixth Circuit held: "Because the definition of the banned procedure includes the D&E procedure, the most common method of abortion in the second trimester, the Act's prohibition on the D&X procedure has the effect 'of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'" *Id.* at 201.

Cir. 2000). Indeed, within the past two years, courts have continued this unbroken line of cases and struck down or enjoined the enforcement of D&E bans that are virtually identical to the Act.[17] No court to consider similar legislation has reached a contrary conclusion.

In sum, a law that bans the most common second-trimester abortion procedure, in the absence of safe and reliable alternatives, cannot stand. The Supreme Court and the Sixth Circuit have each upheld just one method ban, and in each case did so only after confirming that the ban did not reach what the parties agreed was the most common—and safe—alternative method of abortion—that is, D&E. Because the Act bans D&E (and there are no acceptable alternatives), it "impose[s] an unconstitutional undue burden," *Northland Family Planning*, 487 F.3d at 337, and must be enjoined.

### B.  Fetal Demise Cannot Save the Act

The State will likely contend, as have other states in similar litigation, that the Act does not run afoul of this precedent because it does not outright ban D&E, given that it does not apply when physicians cause fetal demise prior to the D&E via a separate procedure. Courts have consistently rejected this argument. *See Williamson*, 900 F.3d at 1327 ("[E]very court to consider the issue has ruled that laws banning dismemberment abortions are invalid and that *fetal demise methods are not a suitable workaround*." (emphasis added)); *see also Whole Women's Health v. Paxton*, 280 F. Supp. 3d 938, 949-52 (W.D. Tex. 2017), *appeal filed*, No. 17-51060 (5th Cir. Nov. 22, 2017); *Hopkins v. Jegley*, 267 F. Supp. 3d 1024, 1064 (E.D. Ark. 2017), *appeal filed*, No. 17-2879 (8th Cir. Aug. 28, 2017). That uniform rejection makes good sense, particularly in light of the Supreme Court's decision in *Stenberg*. There, the Court struck down a statute that, like the Act, banned the performance of D&Es on "living" fetuses (*i.e.*, where the

---

[17] *See* n.14, *supra*.

physician had not first caused fetal demise) even though the Court was aware that some physicians performed demise beginning at 20 weeks LMP. *See* 530 U.S. at 925, 945-46. If the theoretical availability of demise methods did not save the statute in *Stenberg*, it cannot do so here. Indeed, requiring women to endure a separate procedure that is medically unnecessary, inconsistently effective, and sometimes infeasible does not alleviate the Act's undue burden; rather, the requirement itself imposes an undue burden. *See Danforth*, 428 U.S. at 78 (an act imposing gratuitous medical risk on women seeking abortions imposes an undue burden).

The Supreme Court has made clear that a state regulation imposes an undue burden if the burdens it imposes outweighs any benefits it advances. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2309 (2016) (explaining that courts must consider a law's burdens "together with" its benefits (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 887-98 (1992))). Here, the Act greatly burdens women seeking abortions after 15 weeks LMP because it forces them to undergo an additional, invasive medical procedure that provides no attendant benefit in order to access abortion. Keder Decl. ¶ 47. For patients under 18 weeks LMP, these procedures not only add risks but would be experimental procedures that do not comply with medical standards of care. *Id.* ¶ 31. Regardless of the State's asserted interest, no court has ever held that government-mandated imposition of a medically unnecessary, untested, and invasive procedure, or a more complicated and risky medical procedure with no proven medical benefits, is a permissible means of regulating pre-viability abortion. *See Gonzales*, 550 U.S. at 161 (stating that a ban on an abortion method would be unconstitutional if it subjected women to significant health risks).

Indeed, every court to consider a D&E ban like the Act has invalidated it on the basis that demise *cannot* be safely and consistently achieved in every case before a physician performs a

standard D&E.  *See, e.g.*, *Williamson*, 900 F.3d at 1327-28 & n.16 (proposed methods of fetal demise "were not safe, effective, and available"); *Paxton*, 280 F. Supp. 3d at 953 (same); *Hopkins*, 267 F. Supp. 3d at 1064; *accord Farmer*, 220 F.3d at 145 ("The increased risk of injury or death to the woman by attempting to ensure fetal demise in utero … clearly constitutes an undue burden.").  And because demise procedures sometimes fail, physicians will be faced with the choice of either trying again (which is untested, adds further risk, and prolongs the procedure), continuing the procedure and violating the Act, or waiting for the patient's condition to deteriorate to the point where she faces such grave health risks that the Act's narrow health exception is triggered, in violation of medical ethics.  *See* Rivlin Decl. ¶¶ 19, 25; *Stenberg*, 530 U.S. at 945 (law that subjects "[a]ll those who perform abortion procedures using [D&E to the] *fear [of] prosecution, conviction, and imprisonment*" unduly burdens the "right to choose abortion itself (emphasis added)).  There can be no doubt that a law that bans D&E imposes an undue burden on women's access to abortion.

## II.    The Remaining Preliminary Injunction Factors Weigh In Favor Of Plaintiffs

Unless the State is enjoined from enforcing the Act prior to its March 22, 2019 effective date, women seeking second-trimester abortions in Ohio, including Plaintiffs' patients, will face irreparable, immediate injuries to their constitutional rights and to their health and safety.  The deprivation of constitutional rights is itself irreparable harm.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of [constitutional] freedoms … unquestionably constitutes irreparable injury."); *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("[A] plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights.").  Further, Plaintiffs' patients face irreparable harm to their health.  The Act requires that every woman seeking a D&E

18

must first endure a separate, medically unnecessary procedure that introduces additional risk.
*See* Rivlin Decl. ¶¶ 3, 25; Keder Decl. ¶ 29.  As explained above, these procedures add risk at all
stages of pregnancy, but prior to 18.0 weeks LMP, these procedures are additionally
experimental and not the standard of care.  Further, demise methods are not always successful.
Digoxin fails in up to 10% of cases and performing a UCT may not be feasible (particularly early
in the second trimester).  Keder Decl. ¶¶ 34, 43.  But by the time that is apparent, the D&E
procedure will already be underway, and the physician must proceed to the evacuation portion of
the D&E (even without causing demise) to protect her health.  *Id.* ¶ 45; *see supra* pp. 10, 12.
Further, because physicians cannot guarantee that they can safely and reliably cause demise,
some may be unwilling to risk prosecution by even beginning the procedure, possibly denying
their patients access to second-trimester abortion altogether.  *See* Keder Decl. ¶¶ 11, 28.

On the other side of the equation, Defendants will not be harmed by the issuance of an
injunction that preserves the status quo, allowing Plaintiffs to continue to safely provide second-
trimester abortions to their patients, as they have for decades, while the constitutionality of the
Act is adjudicated.  *See Martin-Marietta Corp. v. Bendix Corp.*, 690 F.2d 558, 568 (6th Cir.
1982) (courts must balance irreparable injury against harm that would be imposed on defendants
by granting an injunction).  A preliminary injunction that merely preserves the status quo does no
harm to Defendants.  *See Preterm-Cleveland v. Himes*, 294 F. Supp. 3d 746, 758 (S.D. Ohio
2018) (granting a preliminary injunction against another Ohio abortion restriction found likely
unconstitutional).  Indeed, Defendants have no "interest in enforcing a law that is likely
constitutionally infirm." *Chamber of Commerce of the United States v. Edmondson*, 594 F.3d
742, 771 (10th Cir. 2010).  Courts engaged in this balancing exercise when confronted with
nearly identical laws have repeatedly determined that the irreparable harm caused by a D&E ban

outweighs any harms to defendants. *See, e.g.*, *Paxton*, 264 F. Supp. 3d at 824; *Hopkins*, 267 F. Supp. 3d at 1068; *W. Ala. Women's Ctr. v. Miller*, 217 F. Supp. 3d 1313, 1335 (M.D. Ala. 2016).

Finally, "[t]he public interest in preserving the status quo and in ensuring access to the constitutionally protected health care services while this case proceeds is strong." *Planned Parenthood Sw. Ohio Region v. Hodges*, 138 F. Supp. 3d 948, 961 (S.D. Ohio 2015). "The public interest is promoted by the robust enforcement of constitutional rights," *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp.*, 698 F.3d 885, 896 (6th Cir. 2012), and "[i]t is in the public's interest to uphold [those] right[s] when [they are] being arbitrarily denied … absent medical or other legitimate concerns," *Doe v. Barron*, 92 F. Supp. 2d 694, 697 (S.D. Ohio 1999). Granting a preliminary injunction will thus serve the public interest by ensuring that women continue to have access to constitutionally-protected abortions.

## III. Bond Is Unnecessary In This Case

Finally, the Court should waive the bond requirement of Rule 65(c) of the Federal Rules of Civil Procedure, as the Court may do where, as here, there is no risk of financial harm to the party to be enjoined. *See, e.g.*, *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (district court has discretion to issue preliminary injunction with no bond); *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978) (same).

## CONCLUSION

For these reasons, this Court should grant Plaintiffs' motion for a preliminary injunction and/or a temporary restraining order.

February 14, 2019

MELISSA COHEN (*pro hac vice pending*)
PLANNED PARENTHOOD FEDERATION OF AMERICA
123 William Street, Floor 9
New York, NY 10038
(212) 541-7800
(212) 247-6811 (fax)

RICHARD MUNIZ (*pro hac vice pending*)
PLANNED PARENTHOOD FEDERATION OF AMERICA
1110 Vermont Ave NW, Suite 300
Washington, DC 20005
(202) 973-4800
(202) 296-3480 (fax)

*Counsel for Plaintiffs Planned Parenthood
Southwest Ohio Region, Planned
Parenthood of Greater Ohio, Sharon Liner, M.D.*

Respectfully submitted,

By /s/ Jennifer L. Branch
JENNIFER L. BRANCH (OHIO BAR. NO. 0038893)
*Trial Attorney for Plaintiffs*
GERHARDSTEIN & BRANCH CO. LPA
441 Vine Street, Suite 3400
Cincinnati, OH 42502
(513) 621-9100
(513) 345-5543 (fax)

*Counsel for Plaintiffs Planned Parenthood
Southwest Ohio Region, Planned Parenthood of
Greater Ohio, Sharon Liner, M.D., Women's Med
Group Professional Corporation*

ALAN E. SCHOENFELD (*pro hac vice pending*)
MARGARET ARTZ
LAURA BAKST
WILMER CUTLER PICKERING HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, New York 10007
(212) 230-8800

JENNY PELAEZ
WILMER CUTLER PICKERING HALE AND DORR LLP
350 South Grand Avenue, Suite 1200
Los Angeles, CA 90071
(213) 443-5300

ALLYSON SLATER
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

SARA SCHAUMBURG
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC  20006
(202) 663-6000

*Counsel for Plaintiffs Planned Parenthood
Southwest Ohio Region, Planned Parenthood of
Greater Ohio, Sharon Liner, M.D.*

21

**Certificate of Compliance with SDOH Local Rule 65.1**

Trial Attorney for Plaintiffs has served Counsel for Defendants with a copy of the Complaint, Motion for Preliminary Injunction and/or Temporary Restraining Order, along with the attached Declarations via email immediately prior to the filing of this Motion and that service has been accomplished.

**Certificate of Service**

I hereby certify that on February 14, 2019, a copy of the foregoing pleading was filed electronically.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.  I further certify that a copy of the foregoing pleading and the Notice of Electronic Filing has been served by ordinary U.S. mail and email upon all parties for whom counsel has not yet entered an appearance electronically, including:

Bridget E. Coontz
Assistant Attorney General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
bridget.coontz@ohioattorneygeneral.gov

Putative Attorney for Defendant Yost

Pam Sears
Assistant Prosecuting Attorney
Hamilton County Prosecutor's Office
230 E. Ninth Street, Suite 4000
Cincinnati, OH 45202
Pam.Sears@hcpros.org

Putative Attorney for Defendant Deters

Arthur J. Marziale, Jr.
Assistant Prosecuting Attorney
Franklin County Prosecutor's Office
373 South High Street, 13th Floor
Columbus, Ohio 43215-6318
amarziale@franklincountyohio.gov

Putative Attorney for Defendant O'Brien

Dave Lambert
Assistant Prosecuting Attorney
Cuyahoga County Prosecutor's Office
1200 Ontario Street, 9th Floor
Cleveland, OH 44113
channan@prosectuor.cuyahogacounty.us

Putative Attorney for Defendant O'Malley

Mary Montgomery
Montgomery County Prosecutor's Office
301 W. Third St.
Dayton, OH  45402
montgomerm@mcohio.org

Putative Attorney for Defendant Heck

/s/ Jennifer L. Branch
Jennifer L. Branch
Attorney for Plaintiffs

23