IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PLANNED PARENTHOOD SOUTHWEST OHIO
REGION, *et al.*,

        Plaintiffs,

v.

DAVID YOST, in his official capacity as Attorney
General of the State of Ohio, *et al.*,

        Defendants.

Case No. _____

**DECLARATION OF SHARON A. LINER, M.D., IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, Sharon A. Liner, M.D., declare as follows:

1. I am a board-certified family physician with 15 years of experience in women's health. I am licensed to practice medicine in the state of Ohio. For 12 years, I have been the Director of Surgical Services and since October 2018, the Medical Director of Planned Parenthood Southwest Ohio Region (PPSWO) in Cincinnati, Ohio. I previously worked as a physician at PPSWO from 2004 to 2007.

2. I earned a B.S. in Medical Technology from Michigan State University and graduated from medical school at Michigan State University, College of Human Medicine. I completed my residency in Family Medicine at the University of Cincinnati.

3. In my current roles as the Director of Surgical Services and Medical Director at PPSWO, I supervise physicians and clinicians and provide direct reproductive health care to patients. This includes supervision of the other physicians who perform abortions, including D&E procedures. I also supervise and manage the provision of all surgical services at PPSWO,

including abortion care, and am responsible for developing PPSWO's policies and procedures. Since 2002, I have provided abortions in out-patient settings. In my current practice, I provide medication abortions up to 10 weeks of pregnancy as measured from the first day of the woman's last menstrual period (LMP) and surgical abortions through 21 weeks 6 days LMP.

4. I understand Senate Bill 145 (S.B. 145 or the Act) makes it a crime to perform an abortion procedure known as dilation and evacuation (D&E)—the most common method of second-trimester abortion[1]—unless fetal demise has already occurred. It is my understanding that to continue providing D&Es under the new law, PPSWO physicians would have to successfully cause fetal demise before every procedure—or face criminal charges. Even if we attempt demise in every case, which simply may not be feasible for some women, it is impossible to guarantee that demise can be achieved safely and reliably in every instance.

5. The information in this declaration is based on my personal knowledge unless otherwise noted, and my opinions are based on my education, training, and expertise. If called and sworn as a witness, I could and would testify competently thereto.

**PPSWO AND ITS SERVICES**

6. PPSWO is a nonprofit corporation organized under the laws of Ohio with its headquarters in Cincinnati, Ohio. Although PPSWO is an independent entity, we are a member affiliate of Planned Parenthood Federation of America (PPFA). Our affiliation with PPFA is critical to our core mission of ensuring access to reproductive healthcare. It demonstrates that we meet PPFA's stringent accreditation standards for providing high-quality, expert, nonjudgmental care. Only affiliates that meet these standards are permitted to use the Planned Parenthood name. Medical services at all Planned Parenthood affiliates incorporate the latest

---

[1] The second trimester of pregnancy begins at approximately 14.0 weeks LMP.

research and the most up-to-date standards and best practices for providing reproductive and family planning care.

7. PPSWO provides affordable, respectful, and high-quality health care to tens of thousands of patients in southwest Ohio. We operate seven health centers in the greater Cincinnati and Miami Valley regions. Those health centers provide a wide range of reproductive health services, including well-woman exams, screening for breast and cervical cancer, contraception and contraceptive counseling, and STD testing and treatment. Approximately 75 percent of the patients treated at our health centers are low-income.

8. PPSWO also operates a surgery center in Cincinnati that provides abortion services. This surgery center is the only abortion provider serving Cincinnati, northern Kentucky, and southern Indiana. The nearest abortion provider is 50 miles away in Dayton, Ohio.

**CURRENT ABORTION PRACTICES AT PPSWO**

9. All procedures performed at PPSWO start with a patient evaluation and ultrasound to determine the gestational age of the pregnancy as measured from the first day of the patient's last menstrual period. The method used for the abortion will then depend on the patient's gestational age, as well as other factors, like any complicating medical conditions and the patient's preference.

10. During the first trimester, PPSWO provides two methods of abortion. *First*, we provide medication abortion in which two different medications (pills) are used to induce termination of pregnancy in a process similar to a miscarriage, up to 10 weeks LMP. *Second*, we provide surgical abortions in which we use suction aspiration to perform the procedure, an option that is available throughout the entire first trimester. With this procedure, we first dilate the

cervix enough to allow a suction cannula to pass through the cervix into the uterus and then suction the contents of the uterus.

11. Although most abortions occur in the first trimester, some women need access to abortion care in the second trimester. The factors that lead women to seek second trimester abortions include, among others, cost and access barriers that caused delay, late detection of pregnancy, and the discovery of fetal or maternal health conditions that are not diagnosed until later in the pregnancy. Similarly, the woman may experience health conditions that may not arise until, or may only become complicated in, the second trimester.

12. Beginning at approximately 16 weeks LMP, we find that suction alone is generally no longer sufficient to complete the abortion. Instead, there are two principal methods of abortion. The first involves the use of medications to induce labor, a process known as induction abortion. Induction abortions must occur in a hospital or a similar facility because they can take over 24 hours or more to complete. For this reason, induction abortions are not offered in outpatient facilities like PPSWO.

13. Instead, PPSWO uses a method called dilation and evacuation (D&E). D&E is a quick, safe procedure that can be performed in an outpatient clinic, rather than in a hospital. The D&E procedure has a long-established safety record in this country, due in large part to advances in cervical preparation techniques, improved use of antibiotics, and use of ultrasound guidance. It results in the fewest complications for women compared to alternative procedures and is markedly safer than carrying a pregnancy to term.[2]

---

[2] Elizabeth Raymond, et al., *The comparative safety of legal induced abortion and childbirth in the United States*. Obsterics & Gynecology, 119(2):215–219 (February 1, 2012), https://www.ncbi.nlm.nih.gov/pubmed/22270271.

14. D&E involves two steps: dilating the cervix and then completing the procedure with instruments. First, we dilate the cervix using medications such as misoprostol, placing dilators in the cervix that slowly absorb moisture and swell, or a combination of the two. In the early part of the second trimester, up to about 16 weeks, we almost always perform the cervical preparation and the evacuation on the same day. Later in the second trimester, we typically begin the dilation process the day before. Second, we begin the evacuation phase by using suction to drain the amniotic sac and then use forceps to remove any remaining fetal tissue, placenta, and other contents of the uterus. Because the fetus is larger than the opening of the cervix, the fetal tissue generally comes apart as the physician removes it through the cervix.[3] We then use suction again to ensure that the uterus is empty. The procedure typically takes under 10 minutes.

15. Starting at 18 weeks LMP, but never sooner, PPSWO physicians attempt to cause fetal demise before proceeding to the evacuation process of a D&E with an injection of the drug digoxin. PPSWO uses digoxin to ensure compliance with the federal and state bans on so-called "partial birth abortions" (PBA), not for any evidence-based medical reason. We generally perform a transvaginal injection, which requires us to use a long spinal needle passed through the woman's vaginal wall, or cervix into the uterus. We attempt to inject digoxin into the fetus, if possible or, if not, into the amniotic fluid. If we are unable to inject the digoxin transvaginally, we will attempt to do the injection through her abdomen, which is more painful and often more distressing, since patients are able to see the long needle we must use. The drug can take up to 24 hours to work.

---

[3] We do not dilate the cervix further out of patient safety concerns; we aim to dilate the cervix only enough to safely remove fetal tissue in the manner that is best for the woman.

16. Digoxin, however, is contraindicated for some patients, and it does not always cause fetal demise. It is impossible to know ahead of time whether the digoxin will be effective for any given patient. If the digoxin injection fails to cause demise, PPSWO physicians do not perform a second injection, because such a procedure is unstudied. I am not aware of any physicians in Ohio who do second digoxin injections. Instead, we have attempted to transect the umbilical cord in the case of a digoxin failure, but I cannot know if I will be able to safely do so for any given patient. If I am unable to transect the umbilical cord, I complete the D&E procedure at that point for the safety of the patient even though I have not achieved fetal demise.

17. PPSWO does not use digoxin on patients at gestational ages earlier than 18 weeks LMP because there is virtually no literature supporting its use and because there is very little risk of violating the PBA ban at these earlier gestational ages.

### THE ACT'S IMPACT ON PPSWO'S PRACTICES

18. I understand S.B. 145 bans D&E unless the physician is certain he or she can confirm fetal demise before using forceps to remove fetal tissue. But it is impossible to guarantee that I can confirm demise safely and reliably in each patient without jeopardizing their health. It is my understanding that physicians who violate the statute will be committing a fourth-degree felony. As a health care provider committed to providing safe, evidence-based care, I am deeply concerned that S.B. 145 will harm the health of women in Ohio, as well as their access to abortion care.

19. Digoxin injections do not offer us a safe and reliable way to comply with the statute. Although PPSWO physicians attempt demise using digoxin at 18 weeks LMP to comply with existing federal and state laws, we cannot safely ensure fetal demise before every D&E, as the Act requires. Digoxin can be difficult or simply impossible to administer for certain patients, and it could be dangerous for patients with certain cardiac conditions, like arrhythmia. Further,

-6-

digoxin sometimes simply does not work. As noted above, there is no research on performing a second injection; doing them would entail subjecting our patients to an experimental and medically unnecessary procedure. Performing a second injection could also delay the procedure for another day for no medical reason. Such a delay poses risks to the patient, since a patient's cervix will already be dilated following the first injection, and there is no guarantee that a second injection would work.

20. I am aware that the Act contains a narrow exception for cases in which a patient faces a serious risk of the substantial and irreversible impairment of a major bodily function if the D&E is not completed, but a digoxin failure is extremely unlikely to rise to this level, even though the best thing to do for the patient's health in the case of a failure is to go ahead and complete the D&E procedure. Digoxin simply does not allow us to reliably comply with the Act in all cases, and we cannot know before we begin a procedure whether it will work or not.

21. While we at times have attempted to cause fetal demise by transecting the umbilical cord in the case of digoxin failures, this procedure is not feasible in many cases and cannot be relied upon to comply with the Act's requirement to cause demise before every D&E. Even if we perform cord transections, we do not currently wait to ensure demise has occurred before completing the procedure, as we would need to do if the Act went into effect; doing so would significantly lengthen the evacuation procedure and thus increase the risk to the patient. Further, in some cases, access to the cord is blocked by the fetus and it would be difficult and risky (if not altogether impossible) to reach it. A physician cannot know before beginning a procedure whether she will be able to safely transect the cord. If not, the physician will be faced with an impossible situation. At this point, the patient's procedure has already begun, her cervix is dilated, and her amniotic fluid has been drained; the D&E must be completed because failing

to do so puts the patient at serious risk of infection, extramural delivery and excessive bleeding. But completing the procedure would violate the Act, as even this situation is extremely unlikely to meet the Act's narrow health exception. Finally, and critically, every time a physician tries to locate and grasp the cord, the physician runs the risk of accidentally grasping fetal tissue, particularly since it is sometimes impossible to distinguish between fetal tissue and the umbilical cord once the amniotic fluid has drained out. It is my understanding that grabbing fetal tissue with forceps would violate the Act. Cord transection just does not provide us with a reliable way to comply.

22. While I am aware that some OB/GYNs with a subspecialty in high-risk obstetrics, known as maternal-fetal medicine (MFM), at times use potassium chloride (KCl) to cause fetal demise, neither I nor the other physicians at PPSWO have the extensive training required to use this procedure. I know of no physicians who perform KCl injections in Ohio in an outpatient clinic. For these reasons it would not be possible to incorporate this practice at PPSWO.

23. PPSWO physicians do not currently attempt any demise procedures prior to 18 weeks LMP, yet the Act would require us to subject all of our D&E patients—including those between approximately 16 and 18 weeks LMP—to this additional, medically unnecessary procedure. The available methods of demise pose even greater concerns and risks at this stage of pregnancy, as they would often be experimental, ineffective, and potentially unsafe.

24. As for digoxin, because there is virtually no medical literature supporting the use of digoxin in pregnancies prior to 18 weeks LMP, performing the injections would mean subjecting our patients to experimental and medically unnecessary procedures. Further, because the fetus and uterus are so small prior to 18 weeks LMP, there is a greater risk of inadvertently injecting or perforating other organs, like the bowel. As with patients after 18 weeks LMP,

attempting a second digoxin injection in the event the first injection failed is wholly unstudied and would be experimental. Providing digoxin injections prior to 18 weeks LMP is inconsistent with the standard of care and is not a workable way for us to comply with the Act.

25. Umbilical cord transection is similarly more difficult at earlier gestational ages. The cord is smaller and harder to identify on ultrasound, particularly after the amniotic fluid has been drained out, and thus it would be more difficult to locate and grasp. In some cases, it would be virtually impossible to grasp the cord without accidentally grasping fetal tissue, thereby violating the Act. Again, cord transection does not provide a way for us to reliably comply with the Act at any gestational age.

## CONCLUSION

26. I am extremely concerned about the impact the Act would have on women seeking second-trimester abortions in Ohio. Because it is not possible to ensure fetal demise in every case, and PPSWO physicians cannot know when starting a D&E procedure whether demise will be possible in that particular case, we would risk violating the Act and being subject to criminal prosecution with every D&E procedure we provide. Attempting to comply would require us to subject our patients to untested, experimental procedures that would increase risk and prolong the procedure. This goes against my best clinical judgment and would harm my patients to whom I currently provide safe abortion care.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 13th day of February, 2019.

_____
Sharon A. Liner, M.D.